## THE UNITED STATES DISTRICT COURT
## FOR THE DISTIRCT OF COLUMBIA

| | | |
|---|---|---|
| SHEILA R, HURRY | § | |
|     Plaintiff, | § | |
| | § | |
|     v. | § | Civil Action No. |
| | § | |
| | § | |
| JANET NAPOLITANO, Secretary, | § | |
| Department of Homeland Security. | § | JURY DEMANDED |
|     Defendant | § | |
| | § | |

## COMPLAINT

### TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff SHEILA R. HURRY, in the above numbered and entitled case, complains of

JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY (DHS).

(Hereafter, "Defendant and/or Agency"), Defendant in the above numbered and entitled case, and

for cause(s) of action would respectfully show unto the Court and jury as follows:

### I. PARTIES

1.    Plaintiff, SHEILA R. HURRY, is a citizen of the United States, was the age of 44,

who was employed as a Supervisory Criminal Inspector, GS-1811-14, by the DEPARTMENT OF

HOMELAND SECURITY at the Agency's facility in Washington D.C. during the time period

wherein the present of cause of action accrued. SHEILA R. HURRY has been employed by the

DEPARTMENT OF HOMELAND SECURITY AND ITS LEGACY AGENCIES from 1992 to

the present.    .

SHEILA R. HURRY is a federal employee within the meaning of 29 U.S.C. § 633(a) *et*

*seq,* Section701(f) and Section 717(a) of Title VII, 42 U.S.C. Sec. 2000e(f) and 16(a) and at all

relevant times was a federal employee. SHEILA R. HURRY (Hereafter "Ms. Hurry") is a resident of the city of Bowie, Maryland.

2.    Defendant JANET NAPOLITANO is the SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, which is an agency of the United States government. Defendant does business at the United States Department of Homeland Security, 3801 Nebraska Ave, NW, Washington, DC 20016. Defendant JANET NAPOLITANO is sued in her official capacity as SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, and as such, is amenable to suit as provided in 29 U.S.C. § 633(a) *et seq* and Section701(f) and Section 717(a) of Title VII, 42 U.S.C. Sec. 2000e(f) and 16(a) and may be served by serving Secretary, JANET NAPOLITANO.

## II. JURISDICTION

3.    This action arises under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 *et seq*., 29 U.S.C. § 633(a) *et seq.;* Title VII of the Civil Rights Act of 1964, Section 701 et. seq., as amended, 42 U.S.C.A. 2000e, et. seq., 29 C.F.R. 1614 *et.seq.*, and 28 U.S.C. Section 1346.

4.    All of the necessary administrative prerequisites have been met prior to filing the instant action, as Plaintiff has filed timely complaints of discrimination and retaliation with her federal employer, the Department of Homeland Security, and brings her claims more than 180 days after she filed her complaints.

5.    The District of Columbia is where the action complained of in the present case took place, where the employment records relevant to the unlawful practices are kept, and where the Plaintiff worked during the time period wherein the unlawful actions of the Defendant occurred.

6.      The jurisdiction of the Court is invoked pursuant to 28 US.C. § 1343(a)(4), 29 U.S.C. § 626(c)(1), 29 U.S.C. § 633(a) *et seq.,* 29 U.S.C. Sec. 621 *et seq.* and 42 U.S.C. § 2000E-5 (2012).

### III. VENUE

7.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391 and 42 U.S.C. 2000e-5(f)(3), because the Defendant resides in this judicial district, and a substantial part of the events giving rise to this action took place within this judicial district.

### IV. FACTS

**A.      Ms. Hurry's Employment Experience**

8.      Ms. Hurry is a highly decorated U.S. Army Veteran with various combat experience and training in South East Asia.   While serving as a U.S. Army Military Intelligence Officer, Ms. Hurry served as a Technical Intelligence Analyst Team Leader during Desert Storm and supervised an 11-person team in combat operations.   During this conflict, Ms. Hurry was attached to the 1st Marine Expeditionary Force and served as a subject matter expert on foreign equipment providing real time intelligence to combat commanders on enemy operations.   As a result of Ms. Hurry's exemplary performance and dedication on behalf of her country, she earned the Southwest Asia Service Medal with 3 Bronze Stars and the Liberation of Kuwait Service Medal.   Ms. Hurry was also interviewed by CNN while serving in Asia for her dubious distinction of being the only female serving on the Kuwait-Saudi border.   As noted on Ms. Hurry's Certificate of Release from Active Duty, she possesses 2 years and 7 months of tactical intelligence experience, much of which is related to Asian military and government operations.

9.      Ms. Hurry has been employed by the Defendant since its inception on March 1, 2003, to the present. Prior to March 1, 2003, Ms. Hurry worked for two previous legacy agencies

3

of the Defendant. From on or about September 8, 1992 to July 24, 1993, Ms. Hurry worked for the Defendant's legacy agency, U.S. Immigration and Naturalization Service (INS). From on or about July 25, 1993 to February 28, 2003, Ms. Hurry worked for the Defendant's legacy agency, U.S. Customs.

10.     From on or about March 1993 to July 1999, Ms. Hurry worked as a U.S. Customs Inspector and quickly advanced to the ranks as a Supervisory Inspector due to her strong leadership qualities.   Ms. Hurry supervised several hundred Inspectors in their daily operational duties at the Miami International Airport, one of the busiest airports in the U.S., and soon became a subject matter expert on Customs related laws and duties.   Ms. Hurry completed a 3-month basic course at FLETC where she was recognized as a distinguished graduate and academic scholar graduating at the top of her class.   Additionally, Ms. Hurry has successfully completed the following training courses while serving as a U.S. Customs Inspector: Senior Inspector Training Course (May 1998), 40-hour Equal Employment Opportunity Counselor Course (April 1998), Strategic Problem Solving Training (January 1998), and Passenger Analysis Unit Training (August 1997).

11.     From on or about June 2003 through March 2007, Ms. Hurry served as an Assistant Attaché in the Netherlands.   Prior to this assignment, Ms. Hurry received various training from the Department of State in preparation for her assignment as a country diplomat and subject matter authority on behalf of DHS and the United States.   In this capacity, Ms. Hurry supervised Agency personnel on immigration and customs related investigative matters.   In addition, Ms. Hurry routinely briefed U.S. Congressional delegations, foreign government officials and high-ranking Agency personnel on investigations and national security related matters.

12.     While assigned to the Netherlands, Ms. Hurry was also responsible for Customs

and Border Protection's (CBP) Container Security Initiative (CSI) Program.   As the Team Lead for the CSI Program, Ms. Hurry served as the subject matter expert on targeting high-risk shipments of national security interest and initiating investigations for violations of U.S. laws. During Ms. Hurry's tenure in the Netherlands, she initiated over 100 investigations involving narcotics, child pornography, intellectual property rights, national security, terrorist financing, identity and benefit fraud, human smuggling and trafficking, and the illegal export of strategic equipment and technology, as well as coordinated with domestic Homeland Security Investigations (HSI) offices on these investigations.   Ms. Hurry also assisted the Special Agent in Charge (SAC) Baltimore Office with obtaining permission from Dutch authorities to conduct the first ever-controlled delivery in country, which she participated in.   Ms. Hurry supervised a cadre of supervisory and senior-level Customs and Border Protection (CBP) personnel in the Netherlands and in Belgium.   On a daily basis, Ms. Hurry worked alongside Dutch and Belgium Customs Officers providing expert advice on U.S. immigration and customs related matters. As a result of Ms. Hurry's outstanding leadership and exemplary professionalism, the U.S. Ambassador to The Hague personally recognized her efforts in a letter, dated June 7, 2004, to U.S. Immigration and Customs Enforcement (ICE) Assistant Secretary Michael Garcia.

13.     Prior to her overseas assignment to the Netherlands, Ms. Hurry served as a Senior Special Agent in the SAC Miami Office from 1999 until 2003, where she worked as a field agent on the Miami River and served as the Organized Crime and Drug Enforcement Task Force (OCDETF) Coordinator for South Florida and the Caribbean.   Even as a field agent, Ms. Hurry continued to exhibit extremely high work ethics by conducting complex and multi-jurisdictional investigations that garnered national and international media attention.   One of Ms. Hurry's most notable investigations resulted in the collapse of a Haitian commuter airline, Air d' Ayiti Express.

As a result of Ms. Hurry's vast knowledge and experience, she was instrumental in the arrests of 7 individuals and the seizures of approximately 250 pounds of cocaine and 2 Cessna Caravan airplanes.   Ms. Hurry's expert testimony in court and investigative technical knowledge resulted in the successful convictions of 4 defendants receiving a combined sentence of 53 years in prison.

14.     From March 2007 to October 2008, Plaintiff served as a Program Manager (PM) within the Defendant's Worksite Enforcement (WSE) Unit and on the Defendant's Executive Staff for the Director of Investigations.   As a WSE PM, Ms. Hurry routinely provided direct oversight of large-scale national worksite enforcement operations. This included providing investigative and budgetary guidance/coordination to field-level managers on multi-jurisdictional investigations. Ms. Hurry has also participated in several large-scale worksite enforcement operations around the country.

In April 2008, Ms. Hurry received an ICE Special Achievement Award for her successful planning and coordination of Operation Plymouth Rock, which resulted in 89 criminal arrests and 221 administrative arrests.   Due to Ms. Hurry's outstanding work ethics, she successfully coordinated with 4 ICE Special Agent in Charge Offices and 5 United States Attorney's Offices, as well as the Executive Office of the United States Attorney, and the Office of the Deputy Attorney General in support of this operation.   This included detailing over 1000 special agents to the five effected offices and coordinating with the ICE Office of Detention and Removal Operations and the ICE Office of the Chief Information Officer to ensure that these components were properly prepared to support this large-scale operation.   Ms. Hurry conducted numerous conference calls with senior ICE field leadership and represented ICE Headquarters (HQ) at meetings in Washington, DC and Dallas, TX in preparation for this operation.   As a result of Ms. Hurry's tireless efforts, she coordinated this field operation from HQ and overcame many logistical

challenges.

15.     Since on or about October 2008 until August 2012, Ms. Hurry served admirably as the Transnational Crime and Public Safety (TCPS) Division's Special Assistant to the Deputy Assistant Director (SADAD), which is a Supervisory Criminal Investigator position.   As the SADAD, Ms. Hurry supervised six administrative support personnel and had direct oversight of a multi-million dollar budget in support of four investigative programs.   Ms. Hurry was responsible for the overall administrative and operational functions of the division, to include, but not limited to procurement, human resources, travel, time and attendance, property accountability, and all other issues that arose during the course of the day.   During this time period, Ms. Hurry served as the division's primary liaison to the U.S. Immigration and Customs Enforcement (ICE) Office of the Assistant Secretary, Homeland Security Investigations (HSI) Office of the Executive Associate Director, HSI investigative supervisors and program managers, as well as other internal and external stakeholders.   Ms. Hurry was also responsible for evaluating and reviewing all correspondence for accuracy in response to inquiries from internal and external agencies on behalf of the Deputy Assistant Director (DAD).   Ms. Hurry was considered the subject matter expert for all matters associated with the daily operations and programmatic areas of the division.   Each year, Ms. Hurry earned the highest possible rating (Achieved Excellence) on her performance evaluations for her exceptional work ethics and accomplishments as the SADAD.   Ms. Hurry also received multiple Special Act Awards for her outstanding leadership abilities while serving in this capacity.

16.     On or about August 2012, Ms. Hurry was selected as a Senior Special Agent within the Special Investigations Division of the Department of Homeland Security, Office of Inspector General (OIG).   In this capacity, Ms. Hurry performs analyses and conducts investigations with

regard to a wide variety of misconduct allegations involving high ranking officials of the Department of Homeland Security.  She coordinates, plans and personally conducts the most complex, difficult and sensitive criminal investigations of major importance and high-level interest.

**B.      Discriminatory Non-Selections**

17.      Between 2008 and 2010, Ms. Hurry applied for promotion approximately 50 times and was never selected for any position. Ms. Hurry had served as the Special Assistant to the Deputy Assistant Director (SADAD) for approximately 4 years, the longest ever for a special agent to hold this position.   Despite Ms. Hurry being highly qualified and respected throughout the Agency, she was not afforded an opportunity for promotion, neither temporary nor permanent, or to attend leadership development training like her white male counterparts in spite of her many attempts.   Mr. James C. Spero (Deputy Assistant Director), her then first line supervisor, disingenuously pretended to advocate on Ms. Hurry's behalf. However, it was merely a façade as he successfully assisted white males to gain promotion and attend training.   Typically, the position of SADAD has been a springboard for promotion.   Ms. Hurry was the only SADAD within HSI to have served so long in that position without any opportunity for career advancement, despite her many requests.   All of the white males that have held this position prior to Ms. Hurry have since been promoted to GS-1811-15.

18.      Ms. Hurry's qualifications for each position, that are the subject matter of the present complaint, were plainly superior to those of the selectees. Each time Ms. Hurry was not selected was for one or more of the following unlawful reasons: Ms. Hurry's age (Age 44 at the time of the unlawful non-selections), Ms. Hurry's sex (Female), Ms. Hurry's race (African American, Black).

19.    For approximately two years between 2008 and 2010, Ms. Hurry repeatedly solicited Mr. Spero's assistance with getting promoted and each time she observed him and other HSI managers select individuals less qualified than her to fill the positions.

20.    On or about 2009, Mr. Spero was the recommending official for at least two vacant GS-1811-15 positions within the TCPS Division.

21.    On or about May 12, 2009, Mr. Spero sent Ms. Hurry an email requesting that she prepare a SF-52, Personnel Action, for the temporary promotion of Erik Breitzke to the GS-1811-15 level. On May 14, 2009, Ms. Hurry informed Mr. Spero of a recent announcement of a Supervisory Criminal Investigator (Unit Chief) position in USA Jobs via vacancy number 258100 and her intentions of applying for the job.   Mr. Spero abruptly inquired if she had prepared the personnel action for Mr. Breitzke's temporary promotion without ever acknowledging Ms. Hurry's interest in the position.   Ms. Hurry subsequently applied for the position and made the best-qualified list. However, Mr. Spero selected Mr. Breitzke for the position.   Although the rating is used for the purposes of compiling the best-qualified candidates' list, it also serves as a self-certification tool to showcase the applicants' level of experience.    Ms. Hurry scored 100 and Mr. Breitzke scored a 91, an indication that Ms. Hurry's experience was clearly more advanced than the selectee.   Ms. Hurry continuously observed first hand as Mr. Spero brokered to get white males promoted and/or re-assigned to their location of choice. Temporary promotions are commonly used by HSI management as a precursor to a permanent promotion, as well as a pretext to hide discrimination. Mr. Spero's actions in this instance clearly evidence pre-selection and discrimination.

22.    On or about February 2010, Ms. Hurry applied for the Supervisory Criminal Investigator (Unit Chief) position announced via vacancy number 315118, a position within the

TCPS Division in which Ms. Hurry was assigned.

23.     After numerous unsuccessful attempts at promotion, Ms. Hurry again informed her first-line supervisor, Mr. Spero, of her interests in getting promoted via an email on February 25, 2010.   In the email, Ms. Hurry respectfully requested a recommendation on her behalf for vacancy number 315118. However, Mr. Spero stated during an interview with EEO Counselor Darlene K. Duke in April 2010, that he did not know why Ms. Hurry had not been promoted and did not recall whether Ms. Hurry had applied for the GS-1811-15 position within his division.

24.     On or about June 21, 2010, Ms. Hurry received a copy of the division's Table of Organization (T/O) from Workforce Management, which revealed that Keith Barwick (White Male) had been selected to fill Position ID 8723 (vacancy number 315118) within the TCPS Division. HSI management and Mr. Spero utilized this position to promote Mr. Barwick, a white male who had neither been assigned to nor worked in the TCPS Division.   Once again, Mr. Spero denied Ms. Hurry an opportunity for promotion within her own division where she had worked in an exemplary manner since her arrival to the division in October 2007. Ms. Hurry's qualifications for vacancy number 315118 were plainly superior to that of the Selectee.

25.     On or about February 26, 2010, Ms. Hurry applied for the GS-1811-15 position of Supervisory Criminal Investigator, Assistant Special Agent in Charge (ASAC), position announced via vacancy number 323800. Ms. Hurry was not selected for the position although Ms. Hurry's qualifications for vacancy number 323800 were plainly superior to that of the Selectee.

26.     On February 23, 2010, Ms. Hurry applied for the GS-1811-15 position of Supervisory Criminal Investigator (Deputy Chief of Staff) position announced via vacancy number 317990 and received notification from the Laguna Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

10

27.     Ms. Hurry later learned that the certification list for the announcement had subsequently been returned to the Laguna Service Center with an explanation that the selecting office had decided not to use the certificate, or list of highly qualified candidates.

28.     On or about March 22, 2010, Ms. Hurry became aware that she was not selected for the GS-1811-15 position of Supervisory Criminal Investigator (Deputy Chief of Staff) position announced via vacancy number 317990.

29.     According to the selecting official for this announcement, Chief of Staff (COS) Suzanne Barr, she allegedly did not see or review the competitive certificate for vacancy number 317990 and chose to laterally reassign Edward Dolan (White Male) because she knew him from previous work assignments and was impressed by his performance, organization, and work ethic. In addition, Ms. Barr stated that she frequently travels internationally and knew that Mr. Dolan had the international experience needed for the position.

30.     Ms. Hurry was allegedly never even considered by the selecting official for the position despite her vast qualifications and international experience.  This is one of the many tactics by ICE management to select white males for positions without giving consideration to qualified applicants such as Ms. Hurry.

31.     Currently, there is only one black female GS-1811-15 in HQ and five or less nationwide within HSI.   In light of these statistics, it is evident that black females are not afforded the same opportunities as their white counterparts and are not adequately represented at the GS-1811-15 level within the Agency, despite the existence of qualified candidates such as Ms. Hurry.   It is common practice and knowledge throughout the Agency for ICE management to completely overlook qualified candidates such as Ms. Hurry and instead select white males.

32.     Albeit a lateral reassignment, the selection of Edward Dolan by Ms. Barr was

discriminatory against Ms. Hurry as ICE management repeatedly finds various mechanisms and excuses not to select individuals from the best-qualified lists.  ICE management has exhibited a pattern and practice of recycling white male managers throughout the Agency and limiting the promotional opportunities for qualified competitive candidates; thereby, affording these white male managers an opportunity to further advance in their career and to the detriment of black female candidates such as Ms. Hurry.

33.     On or about January 26, 2010, Ms. Hurry applied for the Supervisory Criminal Investigator (Operations Chief – Asia) position announced via vacancy number 312267 and received notification from the ICE Dallas Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

34.     Some of Ms. Hurry's vast experience working in Asia is outlined in paragraph eight of the present complaint. In addition, in April 1997, Ms. Hurry received training on Korean Intelligence tactics, techniques, and procedures and later participated in two Combined Forces Command Exercises in Seoul and Taegu, Korea.   Ms. Hurry also received 24 weeks of Military Intelligence Training at the United States Army Intelligence School and completed a 4-week Intelligence Analyst Course at Aberdeen Proving Grounds, Maryland.

35.     On or about March 3, 2012, Ms. Hurry became aware that she was not selected for the position. Once again, another white male, named Michael Cox, was selected for the Supervisory Criminal Investigator (Operations Chief – Asia) position announced via vacancy number 312267. This selection is an example of the various mechanisms and excuses used by ICE management not to select individuals from the best-qualified list while continuing to recycle white males throughout the agency and limiting the promotional opportunities for qualified competitive black female candidates.

36.     On or about February 23, 2010, Ms. Hurry applied for the Supervisory Criminal Investigator (Unit Chief) position announced via vacancy number 299257 and received notification from the ICE Dallas Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

37.     In addition to Ms. Hurry's vast experience previously noted in the present complaint, she has served as a Supervisory Criminal Investigator since November 23, 2008 until most recently. In this capacity, Ms. Hurry advised senior level-management within HSI on the investigative program areas within the TCPS Division.   The Unit Chiefs, as well as the DAD, consistently relied upon Ms. Hurry for her guidance and vast knowledge regarding administrative and operational protocols and procedures of the Agency.   Ms. Hurry was considered the "go to" person for all matters associated with the daily operation of the division.   Ms. Hurry was responsible for advising GS-1811-14s and above within the division on agency policies and ensuring their compliance.   Ms. Hurry reviewed and edited all correspondence submitted by the Unit Chiefs for content and accuracy on behalf of the DAD.

38.     Ms. Hurry also served on the Discipline and Adverse Action Panel (DAAP)  for approximately three years due to her sound judgment and diverse disciplinary background, which includes serving as an Intelligence Analyst, Immigration Enforcement Agent (formerly Detention Enforcement Officer), Customs Inspector, and Criminal Investigator.   As a DAAP member, Ms. Hurry was responsible for reviewing misconduct investigations and referrals involving ICE employees to determine appropriate charges and penalties, and issue proposal notices for discipline and adverse action.

39.     On or about November 3, 2010, the HSI Office of the Executive Associate Director issued a message entitled, "Request for candidates to serve upon the DAAP."   Contrary to

13

previous years, the requirements outlined in the memorandum attached to this message stipulated that ICE HSI is currently seeking managers and supervisors at the GS-15 or above grade level to serve as panel board members to the DAAP.   As such, Ms. Hurry voluntarily relinquished her duties as a DAAP member since she did not meet this new requirement; however, Unit Chief Michael Harris contacted Ms. Hurry on or about March 8, 2011, via email, and inquired if she would participate in future DAAP proceedings and she agreed.   This is one of the many examples of how Ms. Hurry, a GS-1811-14, was continuously sought out by HSI management to perform work assignments specified at the GS-15 level such as participating on GS-15 panels and working groups due to her vast knowledge and experience.   Although Ms. Hurry is a GS-1811-14, she had been working at the GS-1811-15 level for several years, but had not been afforded the opportunity of a temporary or permanent promotion despite her extensive qualifications.

40.     On or about April 2, 2010, Ms. Hurry became aware that she was not selected for the Supervisory Criminal Investigator (Unit Chief) position announced via vacancy number 299257. At the time Ms. Hurry applied for this announcement, she possessed the same experience and training as documented in the above paragraphs of the present complaint. However, a younger white male was selected for the position. Ms. Hurry was clearly more qualified for the position than the selectee and her qualifications were plainly superior to that of the selectee.

41.     On or about August 6, 2009, Ms. Hurry applied for the Criminal Investigator (National Security Liaison Officer) position announced via vacancy number 273784 and received notification from the ICE Dallas Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

42.     Ms. Hurry has extensive experience as a Liaison Officer on national and international security related matters.   More specifically, Ms. Hurry has tactical and operational

experience briefing high-ranking officials during peacetime and military combat operations.   In May 2002, Ms. Hurry was summoned to Washington, DC by Assistant Commissioner Donald K. Shruhan, U.S. Customs Service Office of International Affairs and asked to deploy to the Netherlands in support of the CSI initiative due to her impressive and diverse disciplinary background as a Criminal Investigator, Inspector, and Military Intelligence Officer.    An honor Ms. Hurry truly earned as a result of her many years of hard work and dedication.   In Ms. Hurry's capacity as the Assistant Attaché and CSI Team Lead, she served as a Liaison Officer on behalf of the DHS to prominent authorities such as the U.S. Embassy in The Hague, Diplomatic Security Service, Dutch Tax and Customs Administration, Dutch Immigration, Dutch National Police and Belgian Administration of Customs and Excise.   Ms. Hurry's professional demeanor and dynamic personality earned her the respect and trust of her U.S. and foreign counterparts alike.

43.    As a Liaison Officer, Ms. Hurry worked daily with her foreign counterparts on investigations involving the illegal import/export of equipment and technology of national security interest en-route to countries with terrorist ties.   Ms. Hurry coordinated with HSI Special Agents in the domestic field offices on controlled deliveries and suspect shipments en-route to the U.S., Belgium, and the Netherlands.   Ms. Hurry also worked directly with Dutch Immigration Officers at Schiphol Airport in Amsterdam regarding inbound and outbound passengers with ties to terrorist countries/organizations.   As a result of the excellent rapport Ms. Hurry fostered with her foreign partners, she initiated numerous national security related investigations and obtained valuable intelligence for her domestic colleagues on high-risk subjects of national security interest traveling to the U.S.   Ms. Hurry participated in Country meetings and exercises regarding national security matters with other U.S. Embassy personnel representing the Central Intelligence Agency, Regional Security Office, Federal Bureau of Investigation, Drug Enforcement

15

Administration, and U.S. Coast Guard.

44.     Additionally, as a Military Intelligence Officer, Ms. Hurry served as the Battalion S-2 (Security Officer) of the Foreign Materiel Intelligence Battalion in Aberdeen Proving Grounds, Maryland while on active duty.   As the Battalion S-2, Ms. Hurry was responsible for enforcing the provisions of the security requirements of the battalion, which included personnel, physical, and document security.   In this capacity, Ms. Hurry conducted annual security inspections of facilities, weapons, equipment and documents.   Ms. Hurry made the necessary on-the-spot corrections as a result of the security inspections and kept the battalion commander informed of all security related matters.   As early as 1989, Ms. Hurry held and currently holds a Top Secret security clearance. Due to her outstanding accomplishments as a Platoon Leader, Executive Officer, and Security Officer, Ms. Hurry was recognized by the Secretary of the Army and awarded the Army Commendation Medal.

45.     On or about June 1, 2010, Ms. Hurry became aware that she was not selected for the Criminal Investigator (National Security Liaison Officer) position announced via vacancy number 273784. At the time Ms. Hurry applied for this announcement, she possessed the same experience and training as documented in the above paragraphs of the present complaint. However, a white male and a white female were selected for the position. Ms. Hurry was clearly more qualified for the position than the selectees and her qualifications were plainly superior to that of the selectees.

46.     On August 6, 2009, Ms. Hurry applied for the Criminal Investigator (National Security Liaison Officer) position announced via vacancy number 273855 and received notification from the ICE Dallas Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

47.     The National Security Liaison Officer position, under this vacancy, is the same

position as the position identified in paragraph 41 above.   As such, Ms. Hurry possessed the same experience, qualifications, and training as documented in the above paragraphs when she applied for this position.   Ms. Hurry's extensive experience as a liaison on national security matters is also evident based on her assignments and accomplishments, as a Criminal Investigator and Military Intelligence Officer.

48.     On or about June 1, 2010, Ms. Hurry became aware that she was not selected for the Criminal Investigator (National Security Liaison Officer) position announced via vacancy number 273855. At the time Ms. Hurry applied for this announcement, she possessed the same experience and training as documented in the above paragraphs of the present complaint. However, a white female was selected for the position. Ms. Hurry was clearly more qualified for the position than the selectee and her qualifications were plainly superior to that of the selectees.

49.     On October 4, 2009, Ms. Hurry applied for the Supervisory Criminal Investigator (Unit Chief) position announced via vacancy number 289421 and received notification from the ICE Dallas Service Center indicating that she qualified for the position and her name had been certified to the selecting official for consideration.

50.     The position announced via vacancy number 289421 is one of more than 4-dozen GS-1811-15 positions that the Ms. Hurry has applied for since January 2008.   At the time Ms. Hurry applied for this position, she possessed the same experience, qualifications and training as documented in the above paragraphs of the present complaint.

51.     On or about June 1, 2010, Ms. Hurry became aware that she was not selected for the Supervisory Criminal Investigator (Unit Chief) position announced via vacancy number 289421. At the time Ms. Hurry applied for this announcement, she possessed the same experience and training as documented in the above paragraphs of the present complaint. However, a younger

white male was selected for the position. Ms. Hurry was clearly more qualified for the position than the selectee and her qualifications were plainly superior to that of the selectees.

## C.     Other Acts of Discrimination, Retaliation and Hostile Work Environment

52.     On March 29, 2010, Ms. Hurry received yet again another setback for her professional development when Mr. Spero informed her that her request to attend the Executive Potential Program (EPP) had been denied due to lack of funding.   Ms. Hurry had an extremely difficult time accepting the explanation given by Mr. Spero and her second-line supervisor Assistant Director (AD) Michael Holt because she knew first-hand that there was sufficient funding in the division's General Expense (GE) account to pay for this training.

53.     Mr. Spero's initial response to Ms. Hurry after she informed him that the Office of Training and Development would not be able to fund the training was "I'll pay for half."   After another manager in the division voiced his disappointment with Mr. Spero for his denial to pay the entire cost of the EPP training for Ms. Hurry, Mr. Spero elevated the matter to HSI AD Holt. Typically, training requests are approved at the DAD level. However, Mr. Spero elevated the matter to AD Holt only to minimize his involvement in the process.

54.     Agency management officials discriminated against Ms. Hurry because of her race, age, and gender when they denied her the opportunity to attend the EPP, but allowed other HSI employees and Special Agents to attend.   Other HSI employees, as well as three ICE Criminal Investigators, were allowed to attend the training contrary to the affirmations made by Mr. Spero and Mr. Holt that lack of funding was the reason for denying Ms. Hurry's request to attend the EPP. Criminal Investigators assigned to HSI components and other ICE Program Offices/Directorates were allowed to attend the EPP and given an unfair advantage in advancing in their careers, an opportunity that Ms. Hurry was denied by Mr. Spero and Mr. Holt.

18

55.     On or about April 27, 2010, Ms. Hurry filed her first formal complaint of discrimination (HS-ICE-00842-2010) alleging that she was not selected for numerous positions within the Agency due to her race (Black, African American), sex (Female) and age (44 years old at time of formal complaint). On or about September 12, 2012, the Agency issued its Final Agency Decision (FAD) for HS-ICE-00842-2010.

56.     Shortly after Mr. Spero became aware that Ms. Hurry had filed an EEO complaint he began to intentionally over burden Ms. Hurry as a form of retaliation and ongoing discrimination. In addition, Ms. Hurry's workload, as well as the workload of her staff, increased considerably.  Despite the increased workload and numerous requests for assistance, Ms. Hurry was not provided with the necessary resources/support to accomplish those duties.  In addition, Mr. Spero constantly recommended Ms. Hurry for extra duties on top of her already hectic workload. Mr. Spero's intentionally overburdened and did not provide Ms. Hurry with necessary resources as a form of retaliation and discrimination resulting in a hostile work environment for Ms. Hurry

57.     On or about July 2010, the National Gang Unit (NGU) was realigned under the TCPS Division along with a yearly budget of approximately $3 million.

58.     Subsequent to and after September 15, 2010, Ms. Hurry made many unsuccessful attempts to fill a vacant Management and Program Analyst (MPA) position.

59.     At the time period in question, Felicia Clark was the only MPA assigned to the division to manage the budgets for the DAD, WSE, Human Smuggling and Trafficking Center (HSTC) and the most recently acquired NGU.  This issue, as well as the request for additional support, was raised with Mr. Spero *ad nauseam* with negative results.

60.     In other divisions within HSI, there was a MPA assigned to each unit to manage the

19

budget for that particular unit.  However, that was not the case in Ms. Hurry's division.  On numerous occasions, Ms. Hurry mentioned to Mr. Spero that MPA Clark was overwhelmed with the large volume of procurements, requisitions, travel, and other duties associated with the WSE Unit and NGU alone (in addition to the HSTC and other two units) due to the congressional priorities of these programs.

61.     On one occasion, Mr. Spero responded that MPA Clark was a GS-14 and he expected her to handle or delegate some of the work.   Aside from MPA Clark, Ms. Hurry's section was comprised of a Mission Support Specialist (MSS), two Staff Assistants, and a contractor.   The MSS' assistance to MPA Clark was limited due to her lack of knowledge regarding budgetary matters; however, the MSS worked tirelessly assisting MPA Clark to the best of her abilities on a daily basis.  The Staff Assistants were not qualified or at a level to handle these fiscal matters.   It is important to note that Felicia Clark and Annette Owens were the only MPA and MSS assigned to Ms. Hurry's division.

62.     Although the National Gang Unit (NGU) was realigned under the TCPS Division in mid-July 2010, Ms. Hurry immediately solicited the support of DAD Spero to obtain additional staffing for her section to manage the increased workload and additional $3 million budget as a result of this realignment.   Ms. Hurry made several requests that were forwarded to Mr. Spero.

63.     On or about September 13, 2010, Ms. Hurry provided Mr. Spero with a copy of the most recent NGU table of organization via email after briefly discussing the need for a MPA to assist with the recently acquired NGU budget.   In the email, Ms. Hurry specifically stated, "…the NGU table of organization does not reflect an MPA position to handle the budget."

64.     On or about September 15, 2010, NGU Unit Chief (UC) Mark Selby forwarded Mr. Spero and Ms. Hurry an email from Special Assistant Mervyn J. De La Torre officially notifying

them that MPA Angela D. Mathis, who was currently handling the budget for the NGU, was being reassigned from the Operational Support Section to the Illicit Finance and Proceeds of Crime Unit.

65.     On or about September 24, 2010, Ms. Hurry contacted MPA Latisha Falcon, the division point of contact for personnel matters, via email and informed her that the NGU had been realigned under Division 3 and that MPA Mathis currently oversees their budget; however, MPA Mathis was not transferring to the division along with unit personnel.   As a result, Ms. Hurry requested assistance with filling a vacant MPA position within her division to assume these duties.

66.     On or about September 29, 2010, Ms. Hurry contacted MPA Falcon again and requested her assistance with filling the MPA position.   More specifically, Ms. Hurry stated, "…it is imperative that we immediately fill the position for a smooth transition of the budget responsibilities from D2 to D3.   Please let me know the proper procedures/protocols to get this vacancy filled as soon as possible."   (Note: the NGU was realigned from under Division 2 to Division 3).   That same day, Ms. Hurry sent Mr. Spero a message entitled "Important Personnel and Administrative Issues" with a copy of the aforementioned message to MPA Falcon to inform him of several important issues pending within the division, to include the status of filling the vacant MPA position for the NGU.   Mr. Spero never acknowledged Ms. Hurry's concerns or the email.   Ms. Hurry had to verbally confront him with this matter to get a response.

67.     On or about September 30, 2010, NGU UC Mark Selby sent Mr. Spero and Ms. Hurry an email regarding the MPA position for the NGU.   In the email, Mr. Selby advised that as of October 1, 2010, MPA Mathis would no longer be handling the NGU budget.   He also informed Mr. Spero that he and Ms. Hurry had identified an interested candidate currently at their location able to meet their exigent needs and on an active certification list; however, there were ten veterans ahead of her on the list.   Mr. Selby inquired if Mr. Spero was aware of any mechanism

that would allow them to select this individual so that they could have her report immediately. Mr. Spero stated, "No, but we will take a look at it when I get back."

68.     On or about October 5, 2010, Ms. Hurry sent Mr. Spero an email and informed him that they would like to consider Candice Kerr for the vacant MPA position and due to exigent circumstances the NGU needed someone to handle their budget as soon as possible because MPA Mathis had been reassigned to oversee the budget for the Financial Unit.   Ms. Hurry informed him that MPA Kerr was already a GS-14 and currently located in another division within the building. Mr. Selby was also copied on this email.

69.     On October 8, 2010, Mr. Spero responded and stated, "Why would Geddes want to give up an MPA again?"

70.     On October 12, 2010, Mr. Spero forwarded Mr. Selby and Ms. Hurry an email from DAD James Geddes regarding MPA Candice Kerr.   In his email, Mr. Geddes informed Mr. Spero that he had spoken to Karen Caldwell in reference to their conversation regarding MPA Kerr. Mr. Geddes inquired if MPA Kerr applied to the USA Jobs vacancy announcement and if not they would need to see what Workforce Management Acting DAD Ken Kennedy advises on lateral transfers.

71.     Ms. Hurry received concurrence from MPA Kerr's supervisor, Karen Caldwell, who in turn had received approval from Mr. Geddes.    However, Mr. Spero felt that it was not right to temporarily assign MPA Kerr to Ms. Hurry's division without being able to back fill the position in the other division.  This is only one of many instances in which Ms. Spero continuously made pre-textual excuses in response to Ms. Hurry's efforts to promote the efficiency and successful operation of the division. Mr. Spero intentionally did not provide Ms. Hurry a MPA during this time period in order to intentionally overburden her as a form of

retaliation and discrimination.

72.     Since filing her EEO complaint, Mr. Spero continuously recommended Ms. Hurry for various assignments and details as if she was the only one in the division qualified to do anything.  On one occasion, Mr. Spero nominated Ms. Hurry as the division point of contact for the HSI transition team-working group.  Mr. Spero informed Ms. Hurry that the Director's Office had requested a "strong GS-15" from the division to participate in the group.  Mr. Spero advised the Director's Chief of Staff that he had a better suggestion for the working group, a "strong GS-14." As such, Ms. Hurry was nominated as a participant for this working group.  This is another example of Mr. Spero intentionally overburdening Ms. Hurry.

73.     On or about October 22, 2010, Mr. Spero requested to talk to Ms. Hurry and asked that she come into his office.  Mr. Spero raised the issue of Ms. Hurry's EEO complaint during the conversation. Mr. Spero could visibly see that something was bothering Ms. Hurry and inquired several times as to what was wrong.  Mr. Spero stated that he knew that Ms. Hurry wanted to get promoted and that being promoted had a lot to do with timing and luck.  Mr. Spero went on to explain how he and Kevin Sibley (Ms. Hurry's previous supervisor) had managed to excel through the ranks to their current levels due to timing and luck.  At no time did he speak about being qualified or deserving of any of the promotions that he or Mr. Sibley received.  This was very insulting to Ms. Hurry.   Ms. Hurry literally had to sit and listen to Mr.Spero gloat about how easy it had been for him to get promoted throughout his career.  Mr. Spero further stated that Ms. Hurry was NOT going to get promoted without going to the field as a Group Supervisor (GS). Due to the sensitivity of this issue, tears flowed down Ms. Hurry's face and she apologized several times for her display of emotions. Ms. Hurry further advised Mr. Spero that she did not get the same opportunities as most people and things do not just work out for her as they have for him and Kevin

Sibley at which time DAD Spero agreed with her.   He responded "I know."   Mr. Spero went on to say that even on her bad days, like this day, Ms. Hurry still operated at 100 plus percent as opposed to people that are having a good day.   Ms. Hurry was puzzled as to the reason Mr. Spero felt the need to speak to her regarding this matter and she did not think that it was healthy for her or appropriate on his part. The meeting that took place on this day was another form of harassment and retaliation by Mr. Spero against Ms. Hurry.

74.     On or about October 28, 2012, Mr. Spero once again intentionally overburdened Ms. Hurry by tasking her with coordinating a division conference scheduled for the week of December 13, 2010.

75.     On or about November 4, 2010, Ms. Hurry became aware that Mr. Spero intentionally continued to overburden her by requesting that she attend a meeting in Richmond, Virginia.

76.     On or about November 17, 2010, Mr. Spero forwarded an email to Acting DAD Brett Dreyer and Ms. Hurry from Associate Director Kenneth Kennedy regarding overtime conducted by MPA Clark and MSS Owens.  In the message, Mr. Spero wrote "Guys this is too much OT."  Associate Director Kennedy commented in his email, "I am seeing a pattern above…" A review of the message indicated that MPA Clark and MSS Owens averaged approximately eight (8) hours a pay period in overtime.   The overtime was listed for pay periods 14 through 19.   Mr. Spero continued to harass and overburden Ms. Hurry by unjustly complaining about her employee's overtime. In Ms. Hurry's response, she reminded Mr. Spero of a recent conversation with him in October where she had requested additional staffing to assist MPA Clark and Mission Support Specialist (MSS) Owens in their daily duties due to the large volume of administrative functions associated with managing the various budgets, procurements,

travel authorizations and vouchers, as well as personnel issues for the division.   Ms. Hurry further informed Mr. Spero that those two employees had been working tirelessly without any complaints to ensure the successful operation of the division. Mr. Spero replied, "We have to cut back on the OT, especially under the CR."   Ms. Hurry found this remark extremely disturbing especially since she had recently been requested to coordinate a division conference at Disney World, while they were still under a continuing resolution (CR), that had an estimated cost in excess of $300, 000.00.   Field managers had already inquired as to the justification of such a conference while under a CR.

77.      On or about November 17, 2012, Mr. Spero advised Ms. Hurry that one of her employees could not assist her at the Florida conference.

78.      On or about November 24, 2012, one of Mr. Spero's subordinates, Mr. Brett Dreyer, spoke to Ms. Hurry in a highly unprofessional tone.

79.      During the Division's Annual Awards Ceremony on or about December 2010, Mr. Spero acknowledged the Unit Chiefs for their excellent work and contributions within the division over the past year and never once acknowledged Ms. Hurry for her efforts.   In an attempt to correct this blatant oversight, AD Holt recognized Ms. Hurry and her administrative support staff when he addressed the division and further added that without the efforts of the administrative support staff, the division would not have been successful.   As a result of this deliberate oversight by Mr. Spero not recognizing Ms. Hurry, Ms. Hurry became sick to the stomach and left the ceremony.   A few days later, Ms. Hurry was informed by several of her colleagues that after she left the ceremony Mr. Spero chuckled and stated, "Oh, I forgot to mention Sheila" and looked around the room for her at which time he was informed that she had become ill and left the ceremony.   It is important to note that Ms. Hurry was not only responsible for the overall planning

of the awards ceremony, but the successful operation of the division throughout the year. This is another example of Mr. Spero intentionally humiliating Ms. Hurry in front of her peers.

80.     On or about December 15, 2010, Mr. Spero publicly asked Mr. Holt about the employee career path. Mr. Spero intentionally asked this question as a form of retaliation and discrimination towards Ms. Hurry.

81.     The above actions of Mr. Spero and his subordinates were done intentionally to humiliate and harass Ms. Hurry and as a result subjected Ms. Hurry to a hostile work environment.

82.     On or about January 4, 2011, Ms. Hurry filed her second formal complaint of discrimination (HS-ICE-00317-11) alleging discrimination, constituting a hostile work environment, on the bases of race (Black, African American), sex (Female), age (44), and reprisal (prior EEO activity).

83.     On or about October 20, 2011, Ms. Hurry filed her hearing request for HS-ICE-00317-11.

84.     As of the date of this Complaint, an administrative judge has not been assigned to said complaint and more than 180 days have passed since Ms. Hurry filed her second complaint of discrimination.

85.     On June 27, 2012, HSI Executive Associate Director James A. Dinkins spoke to a group of HSI personnel during a breakout session at the 2012 Women in Federal Law Enforcement (WIFLE) Leadership Conference. During his speech, Mr. Dinkins made several inappropriate and unprofessional comments. The following are only two comments made by Mr. Dinkins that evidence the discriminatory and retaliatory animus of the Agency:   "I thought I was going to be able to hang out with the bitches, but my wife and daughter decided to come with me." and "If you

have been putting in for promotion and putting in for promotion, and nobody has selected you, it's not discrimination. You may want to look in the mirror, you might just be an ass hole."

86.     Ms. Hurry was clearly more qualified than the selectees for the positions that are the subject of this Complaint and her qualifications were plainly superior to that of the selectees. At all relevant times, Ms. Hurry continued to be qualified to fulfill the requirements of the positions, and desired to be selected for the positions.

87.     Because age was a motivating factor and made a difference in the decision not to promote Ms. Hurry, the Defendant violated the Age Discrimination in Employment Act with knowing or reckless disregard of the Act's proscriptions.

88.     On information and belief, Ms. Hurry asserts that the Defendant acted with malice and in reckless disregard of Ms. Hurry's rights and welfare.

89.     Defendant, through its subordinates, retaliated against Ms. Hurry and continued to retaliate against Ms. Hurry for engaging in the EEO process in violation of the ADEA and Title VII.

## V.     CAUSES OF ACTION

90.     Ms. Hurry incorporates the preceding and proceeding paragraphs into this paragraph by reference. The above described facts constitute retaliation and discrimination based on age, sex, and race in violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 633(a) *et seq.*, 29 U.S.C. § 621 *et seq.*, and Title VII.   Defendant's reasons for not selecting Ms. Hurry were pretext for its true reason for not selecting her intentionally because of her age, sex and race, as well as being in retaliation for Ms. Hurry's opposition to such unlawful conduct.

91.     Ms. Hurry incorporates the preceding and proceeding paragraphs into this paragraph by reference. Ms. Hurry was subjected to a hostile work environment based on age, sex race and retaliation in violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 633(a) *et seq.*, 29 U.S.C. § 621 *et seq.*, and Title VII.

92.     Ms. Hurry incorporates the preceding and proceeding paragraphs into this paragraph by reference. Defendant's conduct in harassing and not promoting Ms. Hurry violates the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 633(a) *et seq.*, 29 U.S.C. § 621 *et seq.*, and Title VII. Ms. Hurry is suffering and will continue to suffer irreparable injury as a result of the acts of the Defendant.

## VI.     DAMAGES

93.     Ms. Hurry's claims of discrimination and retaliation are within the jurisdictional limits of this Court.

94.     Ms. Hurry incorporates the preceding and proceeding paragraphs into this paragraph by reference. The conduct described above proximately caused actual and compensatory damage to Ms. Hurry, including but not limited to lost wages, benefits, humiliation and emotional distress, physical pain and suffering, medical services and medications in the past and in the future, damage to her personal reputation, damage to her professional reputation, damage to her earning capacity, and damage to her enjoyment of life.

95.     Ms. Hurry is entitled to recover reasonable attorney fees pursuant to EAJA 28 U.S.C. § 2412(b), Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 633(a) *et seq.*, 29 U.S.C. § 621 *et seq.*, and Title VII..

## PRAYER FOR RELIEF

96.     WHEREFORE, Ms. Hurry requests that this Honorable Court advance this case on the docket, order a jury trial at the earliest practical date, and grant Ms. Hurry the following relief pursuant to all federal law and statutes cited in the preceding and proceeding paragraphs, including, but not limited to the following:

(a)     Grant. Ms. Hurry a permanent injunction enjoining Defendants, their agents, successors, employees, and those acting in consort with Defendants, from continuing to violate Ms. Hurry's rights;

(b)     Issue an order requiring Defendant to promote Ms. Hurry to a GS-1811-15 position and/or at a higher position to which she is entitled by virtue of her responsibilities and qualifications or award front pay if such promotion is not feasible;

(c)     Issue an order awarding Ms. Hurry back pay, fringe benefits, and any other appropriate relief necessary to make Ms. Hurry whole and compensate her for the civil rights violations described above;

(d)     Award Ms. Hurry compensatory/mental anguish damages;

(e)     Award Ms. Hurry prejudgment and post-judgment interest as allowed by law;

(f)     Award Ms. Hurry attorney fees and costs of this suit;

(g)     Award Ms. Hurry such other legal and equitable relief as this Court deems just and proper;

(h)     Award Ms. Hurry damages requested in part VI of this Complaint;

(i)     Award Ms. Hurry all other relief, in law and equity, to which Ms. Hurry

may be entitled.

Respectfully submitted,

/S/ Ronald H. Tonkin

_____

Ronald H. Tonkin
Attorney for Plaintiff
2777 Allen Parkway-Suite 1000
Houston, Texas 77019
Tel. 713-942-9111
Fax 713-942-0102
E-mail: rhtonkin@juno.com

Of Counsel:

Ashok Bail
Attorney for Plaintiff
3120 Southwest Freeway, Suite 450
Houston, TX 77098
Tel. No. (713)-255-1088
Fax. No. (832)-263-0616